CARAWAY, J.
|, Marvin W. Davis was charged by bill of information with three counts of aggravated battery in violation of La. R.S. 14:34 and La. R.S. 46:2132, the Domestic Violence Act. A jury of six unanimously convicted Davis of two counts of aggravated battery. Davis was subsequently adjudicated a fourth felony offender, with all four convictions being crimes of violence, and was sentenced to the mandatory term of life imprisonment. Davis appeals, raising three assignments of error. We affirm Davis’ convictions. We vacate his adjudication as a fourth felony offender and remand for resentencing.

Facts

On May 2, 2011, the DeSoto Parish Sheriffs office was dispatched to a home in DeSoto Parish shared by Marvin W. Davis and his girlfriend, Connie Samuels. Connie’s two sons, 14-year-old DS and 10-year-old RS, were living with their mother. To summon the police, DS had jumped out of a window of the home and called authorities to report that his stepfather, Davis, had battered the boys and their mother during an angry tirade. The deputies first encountered DS, who was panicked and had a cut on his left wrist.
*1209 Upon arrival at the home, one sheriffs deputy met Davis who told them that he had hit one of the boys in the head with a water bottle. The deputy then spoke with Connie who had a swollen and cut left hand. Connie informed the deputy that during an altercation, Davis hit her and her boys with a mop handle and PVC pipe and then hit her in the head with a 12metal pot. The mop handle, which was in three broken parts, a white PVC pipe and a metal pot were found at the scene and photographed. Both Connie and DS gave statements to the deputies implicating Davis as the perpetrator. Thereafter, Davis was arrested and charged with three counts of aggravated battery under the Domestic Violence Act. Count One concerned Connie, Count Two, RS and Count Three, DS. After trial, a unanimous jury convicted Davis of Counts One and Three, but acquitted him of Count Two. The trial court denied a subsequent Motion for Post-Verdict Judgment of Acquittal.
The state filed a habitual offender bill and subsequently proved two prior crimes of violence. Davis was adjudicated a fourth felony offender based on the two prior felonies and the two instant convictions and sentenced to life. This appeal ensued.

Discussion

In his second assignment of error, Davis argues that the trial court erred, as a matter of law, in denying his Motion for Post-Verdict Judgment of Acquittal due to the insufficiency of the evidence to support his conviction on Counts One and Three. The crux of Davis’ argument is that a broken mop handle, piece of PVC pipe and a metal pot are not dangerous weapons and, thus, the state failed to meet its burden of proof for the aggravated burglary convictions.
When several issues are raised on appeal and one or more questions involve the sufficiency of the evidence, the reviewing court should review the sufficiency claims first because the accused may be entitled to an ^acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, - U.S. -, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court review *1210 ing the sufficiency of | ¿evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Credibility determinations are the province of the trier of fact. State v. Johnson, 38,927 (La.App.2d Cir.11/23/04), 887 So.2d 751; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support the requisite factual conclusion. Id.
| ¡Aggravated battery is a battery committed with a dangerous weapon. La. R.S. 14:34. A battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33. A dangerous weapon is defined as “including any instrumentality, which in the manner used, is calculated or likely to produce death or great bodily harm.” La. R.S. 14:2(A)(3). Therefore, in order to convict the defendant of aggravated battery, the state must prove (1) that the defendant intentionally used force or violence upon the victim, (2) the force or violence was inflicted with a dangerous weapon, and (3) the dangerous weapon was an instrumentality used in a manner likely or calculated to cause death or great bodily harm. State v. Ealy, 44,252 (La.App.2d Cir.5/13/09), 12 So.3d 1052, writ denied, 09-1393 (La.2/5/10), 97 So.3d 1011.
Whether a weapon is dangerous is a factual question for the jury to determine upon considering not only the character of the weapon, but by whom, upon whom, and in what manner it was used. State v. Pamilton, 43,112 (La.App.2d Cir.3/19/08), 979 So.2d 648, writ denied, 08-1381 (La.2/13/09), 999 So.2d 1145, citing State v. McClure, 34,880 (La.App.2d Cir.8/22/01), 793 So.2d 454 and State v. Taylor, 485 So.2d 117 (La.App. 2d Cir.1986). Louisiana jurisprudence reveals that numerous everyday items have been held to constitute a “dangerous weapon,” in the manner used, including a stick, an ink pen, rum, a tennis shoe, a metal pipe, a paint can, a bottle and a mop handle. State v. Pamilton, supra; State v. Tyner, 41,937 (La.App.2d Cir.2/28/07), 953 So.2d 865; State v. Malhiot, 41,175 (La.App.2d Cir.8/23/06), 938 So.2d 1158, writ denied, 06-2352 (La.4/27/07), 955 So.2d 682; State v. McClure, supra; State v. Johnson, 598 So.2d 1152 (La.App. 1st Cir.1992), writ denied, 600 So.2d 676 (La.1992); State v. Munoz, 575 So.2d 848 (La.App. 5th Cir. 1991), writ denied, 577 So.2d 1009 (La.1991).
At trial, Connie testified first and stated that she and Davis had known each other their entire lives and had been romantically involved since they were 18 years old. Connie was treated as a hostile witness *1211 after a portion of her testimony because she stated repeatedly that she did not want to testify, that Davis was not a “bad person” and did not “deserve life.”
Connie explained that on May 2, 2011, she was in her bedroom, after dinner, when RS came into her room and told her that Davis said he was going to kill him.[1] Connie testified that she went into the kitchen, where Davis was trying to get the younger boy to wash the dishes. DS also went into the kitchen. Connie described what happened next as a “little conflict” about the boys washing the dinner dishes. She conceded that Davis ordered the three into a corner and that she stood in front of the boys to protect them. During her testimony, Connie identified a broken metal mop handle, a piece of PVC pipe and a metal cooking pot that Davis used to hit her and the boys, but stated that it was “nothing heavy.”
Connie agreed that she threw her hands up to “block a lick from the mop handle” and was cut on the hand by the jagged metal end where the mop handle was broken. She denied being hit with the PVC pipe, but 17testified that Davis did hit her with the metal pot “kinda like up beside my head.”
When the incident subsided, Connie and the boys went into a bedroom and she told DS to jump out of the window and call the police. She also testified that Davis came into the bedroom and apologized.
During her testimony, Connie was questioned about the statement she gave to police immediately following the incident. She testified that her statement was written by a friend because of the cut to her hand. In that statement, Connie told police that the defendant was “gonna kill” her son and that DS has asthma and Davis hit him in the chest and broke the PVC pipe hitting him.
DS also testified and identified his statement given to officers immediately after the incident, which was read to the jury:
I was in my brother room. My brother went to my mom room and said that Marvin Davis pulled a knife and said he was going to kill him. I came in later. He told me to get over there with my mom and brother in a corner. He started to hit us with a mop. The mop broke on my wrist and cut me deep. He hit my mom in the head with a metal pot. I have asthma and he kept hitting me in the chest. I couldn’t breathe for a few minutes.
DS agreed that he told the truth in the written statement. While he was adamant that he was not afraid that night, DS conceded that Davis beat his mother, brother and him with the mop. He testified that the mop broke on the washing machine when the defendant was trying to hit his mother. DS conceded that his mother was hit with a water pipe and a metal pot. DS recounted that he jumped out of the window and ran to his uncle’s house to |gcall the police when his mother told him to “because things was getting out of hand.”
RS was 11 years old at the time of trial. He testified that the reason the police were called to his house that evening was because Davis “held us hostage.” RS stated that his mother “would jump in front of us and she’ll take the hit and throw her hands up.” He stated that his mother was hit and DS’s wrists were injured. RS did not testify affirmatively that he was hit or injured.
*1212 Deputy Casey Hicks was the responding officer on the night of the incident. Deputy Hicks confirmed the fear of the children and the evidence of use of force. He stated that Connie advised that Davis had hit her and the children with PVC pipe, a mop handle and a metal pot. Hicks further stated that Connie told him that she was trying to stay between Davis and the boys, but the metal end of the mop handle hit DS and injured his wrists.
After the deputy’s testimony, the state rested and the defense did not put on any evidence.
When viewed in the light most favorable to the prosecution, we find the evidence sufficient to convict Davis of aggravated battery. The evidence shows RS initially summoned his mother because of Davis’ threat to kill him. When confronted, Davis intentionally ordered Connie and her sons into a corner and beat the boys and their mother with a metal mop handle and a broken PVC pipe. He also hit Connie in the head with a metal pot.
|aStatements from the victims establish Davis’ threats to kill. When combined with his subsequent acts of cornering the three victims and hitting them with the various objects inflicting serious injury to two of them, the jury could have reasonably inferred from this evidence Davis’ intent to cause death or great bodily harm to the victims. The ordinary household items were utilized by Davis to physically beat and injure Connie and DS. The degree of injury actually inflicted is not dis-positive of whether an item constitutes a dangerous weapon. Rather, it is the manner in which the items are used, i.e., a manner reasonably calculated to lead to death or serious bodily harm. Under the facts presented to it, the jury was reasonable in concluding that the items, as used by Davis accompanied by his threats, constituted dangerous weapons as contemplated by the statute. State v. Pamilton, supra. This assignment is without merit.
Davis also argues that the district court erred, as a matter of law, in overruling the Batson[2] challenge to the State’s peremptory challenges of the only black prospective jurors, resulting in an all-white jury.
The jury of six persons was all white. However, there were only two African-Americans in the sole panel drawn from the jury venire which was composed of 18 persons. Juror MW (black male) and Juror MH (black female) were ultimately excluded by the state by the use of peremptory challenges.
Initially, the state had challenged these same jurors for cause. The trial judge denied the challenge for cause for Juror MW and deferred ruling [1flon the challenge on Juror MH until the challenges to the initial 12 persons on the panel were completed. The state subsequently exercised four peremptory challenges against three white jurors and Juror MW. The defense exercised four peremptory challenges against white jurors. At this point, there were five remaining jurors that were preliminarily accepted and the remaining six were presented for challenges for cause. The trial judge noted that, should the state re-urge a challenge for cause against Juror MH, it would be denied. The state then exercised a peremptory challenge against Juror MH and defense counsel entered a Batson objection.
The trial judge overruled the objection, stating that there had not been a preliminary showing of a pattern of racial dis *1213 crimination. Nevertheless, the judge went further, stating that “[the state] had advanced and articulated for the record sufficient or what they believed were sufficient grounds for challenges for cause, which the Court ultimately rejected.”
During voir dire, Juror MW indicated that Davis reminded him of a family member and that he would have a hard time convicting him for that reason. The district attorney asked Juror MW, “and the fact that he looks like someone that you know, would that prevent you from convicting him?” Juror MW responded, ‘Tes, I believe it would.” Later during questioning, however, Juror MW agreed that he could “go by the evidence” and his verdict would not have anything to do with whom Davis may look like.
The following colloquy took place between counsel and the trial judge when the state challenged Juror MW for cause:
District Attorney: Judge, I’m a little bit concerned about [MW]. He kind of vacillated back and forth [non knowing, looking at the guy, you know, he couldn’t convict him. And, you know, I think it’s about him not wanting to serve more than anything else.
The Court: He also tried to get off for another reason and I wouldn’t let him off, a non-medical reason.
District Attorney: And I think it’s problematic because he is looking for a reason. I asked him if we prove the case, he said no. You know, I’m just concerned about him.
The Court: Well, unfortunately, I think you rehabilitated him, so that’s denied.
Regarding Juror MH, the following colloquy took place:
District Attorney: Okay. [MH], Judge. Just inattentive, sleeping.
The Court: I was a little concerned about her. She really didn’t really seem too much engaged. What do you think about her? (to defense counsel)
Defense counsel: I thought totally opposite. She look at [the DA] when he was talking. She looked at the screen—
The Court: I want to make sure, that’s 13?
District Attorney: Yes. She was sleeping.
Defense counsel: No. She responded to the questions he asked. When he changed the screen, she looked at it. If he had an issue, he should have asked her more questions. I thought she was good.
In denying the challenge for cause as to Juror MH, the trial judge noted that “different jurors have different affects and her answers were, of course, very appropriate.”
In State v. Nelson, 10-1724 (La.3/13/12), 85 So.3d 21, the supreme court succinctly recited the law concerning the prohibition against the exercise of peremptory challenges based upon race as follows:
li2In Batson, the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Equal Protection Clause. Batson, 476 U.S. at 96-98, 106 S.Ct. 1712. The holding in Batson was initially adopted by this Court in State v. Collier, 553 So.2d 815 (La.1989), and has been codified by the legislature in Louisiana Code of Criminal Procedure article 795(C) and (D).
[[Image here]]
The Court in Batson outlined a three-step test for determining whether a peremptory challenge was based on race. *1214 Under Batson and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. Third, the trial court then must determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. Batson, 476 U.S. at 94-98, 106 S.Ct. 1712. See also, Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005); State v. Sparks, 1988-0017 (La.5/11/11), 68 So.3d 435, 468; State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443, 448.
[[Image here]]
To establish a prima facie case, the objecting party must show: (1) the striking party’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory was used to strike the venire person on account of his being a member of that cognizable group. Batson, 476 U.S. at 96, 106 S.Ct. 1712; Sparks, 68 So.3d at 468; Givens, 776 So.2d at 449. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). Sparks, 68 So.3d at 468-89; State v. Duncan, 1999-2615 (La.10/16/01), 802 So.2d 533, 544.
In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, multi-factors for determining whether the prima facie case were discussed:
The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury | ^finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
No formula exists for determining whether the defense has established a pri-ma facie case of purposeful racial discrimination. State v. Jacobs, 99-0991 (La.5/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002). Batson accords a trial court considerable flexibility and broad discretion in this regard because “trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor’s use of peremptory challenges create a prima facie case of discrimination against black jurors.” Batson, 476 U.S. at 97, 106 S.Ct. at 1723; State v. Jacobs, supra.
Bare statistics alone are insufficient to support a prima facie case of discrimination. Furthermore, the value of numbers alone, without any indication of the race or gender composition of the jury selected or the pool from which it was drawn, is limited at best. State v. Holand, 11-0974 (La.11/18/11), — So.3d -, 2011 WL 6153193, cert. denied, — U.S. -, 132 S.Ct. 2682, 183 L.Ed.2d 48 (2012).
The trial court plays a unique role in the dynamics of voir dire, for it is the court that observes firsthand the demean- or of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general *1215 atmosphere of the voir dire that simply cannot be replicated from a cold transcript. See State v. Jones, 42,531 (La. App.2d Cir.11/7/07), 968 So.2d 1247. Thus, the trial court’s determination that the defense failed to set forth a prima facie case of purposeful discrimination | umerits great deference on appeal. State v. Mason, 47,-642 (La.App.2d Cir.1/16/13), 109 So.3d 429, citing State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir.1991), writ denied, 594 So.2d 1317 (La.1992).
In this matter, the trial court found that the defense had not made a prima facie showing that the district attorney exercised the two peremptory challenges against Jurors MW and MH on the basis of race. Of course, neither the total exclusion of a cognizable group from the jury nor the mere presence of one or two perhaps token members of the group on the jury is dispositive of whether the pri-ma facie requirement is satisfied. State v. Duncan, supra. Nevertheless, the composition of the 18-member pool with the small percentage of African-Americans and the state’s 100% exclusion of African-Americans makes the issue of the prima facie showing a difficult question statistically and otherwise.
Even so, we find it unnecessary to address this concern as we find no error in the trial court’s further determination that the state provided race-neutral reasons during the challenges for cause for excluding these two potential jurors. Regarding Juror MW, the state and the trial court expressed concern for his desire not to serve on the jury and his statement that he may not be able to convict the defendant because he resembled someone in the juror’s family. As to Juror MH, both the state and the trial judge expressed concern about her inattentiveness and sleeping, although the defense disagreed. These reasons are not inherently discriminatory and suffice as race-neutral reasons for the peremptory challenges to the jurors. This assignment of error has no merit.
h.Jn his final assignment of error, Davis argues that the trial court erred, as a matter of law, in adjudicating him a fourth felony habitual offender and sentencing him to life imprisonment.
The habitual offender bill charged Davis as a fourth felony offender based on a 1995 manslaughter conviction for which he was sentenced to 10 years at hard labor and a 2004 second degree battery conviction for which he pled guilty and was sentenced to three years at hard labor. The third felony offense would have to be supplied by one of the two present aggravated battery convictions. At the hearing, defense counsel objected to the use of the two current offenses as predicate offenses based on La. R.S. 15:529.1(A). The objection was overruled and Davis was ultimately adjudicated a fourth felony offender and sentenced to life imprisonment.[3] Davis asserts this ruling as error.
The purpose of the habitual offender law in La. R.S. 15:529.1 is to deter and punish recidivism, and a defendant becomes a recidivist at the time of the commission of the subsequent crime, whether or not he has previously been exposed to sentencing as a habitual offender. State v. Johnson, 03-2993 (La.10/19/04), 884 So.2d 568.
The first sentence of La. R.S. 15:529.1(A)(1) states, “Any person who, after having been convicted in this state of a felony ..., thereafter commits any subse *1216 quent felony within this state, upon conviction of said felony, shall be punished as follows.” (Emphasis added). This portion of the statute, and the jurisprudence interpreting it, require that the prior 11 ^conviction must precede the principal offense in order to be used as a predicate to enhance a defendant’s status as a multiple offender. State v. Jackson, 43,139 (La.App.2d Cir.3/26/08), 979 So.2d 678, writ denied, 08-0952 (La.12/12/08), 997 So.2d 560; State v. Roshell, 40,374 (La.App.2d Cir.12/14/05), 916 So.2d 1268, writ denied, 06-0771 (La.10/6/06), 938 So.2d 69; State v. Ball, 32,498 (La.App.2d Cir.12/15/99), 748 So.2d 1249, writ denied, 00-0506 (La.10/6/00), 770 So.2d 364.
One of the two aggravated battery convictions now on appeal has enhanced the punishment for the other aggravated battery conviction. Nevertheless, recidivism or repeat offender misconduct can hardly be said to have occurred for these crimes arising out of the same criminal episode. From the quoted language of the act, one of the two present crimes is not a “subsequent felony” with the defendant “having been” previously convicted of the other. The goal of the habitual offender law is to dissuade first offenders from committing subsequent felonies. State v. Shaw, 06-2467 (La.11/27/07), 969 So.2d 1233. Accordingly, with the two aggravated convictions occurring together in this case and arising from the same event, we vacate Davis’ adjudication as a fourth felony offender.
We note also that the trial court failed to specify which count was being enhanced and only one of the two present convictions received a sentence. We have held that if a court fails to impose a sentence for each conviction or fails to specify which of the two sentences is being enhanced the sentence or sentences are not definitive, are set aside and the defendant is remanded for resentencing as the law directs. State v. Mayweather, 28,271 (La.App.2d Cir.6/26/96), 677 So.2d 594. See also, State v. Valentine, 95-0970 (La.App. 4th Cir.1/19/96), 668 So.2d 383, writ denied, 97-2011 (La.2/13/98), 706 So.2d 988. Therefore, we remand for new habitual offender proceedings and sentencing with instructions to the trial court to specify which count is being enhanced and for resentencing on the count of conviction not enhanced.

Decree

For the foregoing reasons, the convictions of Marvin W. Davis are affirmed. His fourth felony offender adjudication and sentence are vacated. The matter is remanded for new habitual offender proceedings and sentencing for the convictions.
AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.

. In an obvious effort to minimize the actions of Davis, Connie explained he said things like this to the boys every day and that she consistently tried to get Davis to discipline the boys who were "rowdy” and "bow[ed] up” when they were told to do something.

. The objection was lodged in accordance with Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Whether he is considered a fourth or third felony offender, the mandatory term for sentencing is life imprisonment.